# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# EASTERN DIVISION

**DENNIS L. WATKINS, JR.**                                          **PLAINTIFF**

v.                  No. 2:16-CV-00115-BSM-JTR

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner,**
**Social Security Administration**                            **DEFENDANT**

## RECOMMENDED DISPOSITION

**I.**      **Procedures for Filing Objections:**

The following Recommended Disposition ("Recommendation") has been sent to Chief United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

**II.**      **Introduction:**

On April 12, 2004, Daniel Watkins ("Watkins") filed for social security disability benefits. (R. at 49-50, 206, 223-24). On May 23, 2007, an administrative

---

[1] Berryhill is now the Acting Commissioner and is automatically substituted as Defendant pursuant to Fed. R. Civ. P. 25(d).

law judge ("ALJ") held that Watkins was not entitled to disability benefits. (R. at 13-18). After the Appeals Council denied Watkins's request for review (R. at 4), he appealed to the United States District Court for the Eastern District of Arkansas.

On June 23, 2010, the district court affirmed the Commissioner's decision, and Watkins appealed. *See Watkins v. Astrue,* E.D. Ark. No. 2:09CV00048-JTR. On March 31, 2011, the Eighth Circuit reversed and remanded the case for further administrative proceedings, because "substantial evidence does not support the ALJ's adverse credibility determination on Watkins's subjective mental complaints or the ALJ's mental RFC determination." (R. at 388–400). *Watkins v. Astrue,* 414 F. App'x 894 (8th Cir. 2011).

On November 9, 2012, after another administrative hearing, a second ALJ held that Watkins was not entitled to disability benefits. (R. at 404-14). On September 17, 2013, the Appeals Council remanded the case for further evaluation,[2] and specifically directed the ALJ to obtain a consultative mental examination, "if warranted and available." (R. at 417-19).

On May 21, 2015, after a third administrative hearing, the ALJ in this case denied Watkins's application for disability benefits. (R. at 258-73). On July 18,

---

[2] The Appeals Council held that the second ALJ: (1) failed to consider whether drug addiction or alcoholism contributed to Watkins's mental impairments; (2) erred in including in the sedentary RFC an "at will" sit/stand option without specifying the frequency of Watkins's need to alternate sitting and standing; and (3) erred in restricting Watkins's RFC to "incidental" contact with the public, which was "vague and unclear." (R. at 417-18).

2

2016, the Appeals Council denied his request for review (R. at 249-51), making the ALJ's decision the final decision of the Commissioner. On August 29, 2016, Watkins initiated this action in federal court.[3]

For the reasons stated below, the Court recommends reversing and remanding the Commissioner's decision and ordering an immediate award of benefits to Watkins.

III. **The Commissioner's Decision:**

After conducting an administrative hearing, the ALJ rendered a decision finding that Watkins had severe impairments of mild right curvature of the thoracic spine and a shallow disk bulge at T7–T8, with reported back pain and joint pain; but, all of his mental impairments were *non-severe*. (R. at 261-62). Based on his severe physical impairments and work history, the ALJ concluded that Watkins had the residual functional capacity ("RFC") to perform unskilled *light work*, performed by rote and involving contact with others that was superficial to the work performed,

---

[3]The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:
> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

with only occasional climbing, stooping, crawling, crouching, and overhead reaching. (R. at 263).

After taking testimony from a vocational expert ("VE"), the ALJ concluded that Watkins was not disabled because his RFC allowed him to return to his past relevant work as an agricultural insect control inspector. (R. at 272-73).

During the administrative hearing, the ALJ *specifically noted* the many years Watkins's disability claim had bounced among administrative and judicial proceedings and he vowed to give the case the time and attention it required to finally reach the right result:

> "Believe me, I've read it all. … I spent half a day going through this file." (R. at 349).

\*\*\*

> "What I've done is I've established to you [counsel] and to Mr. Watkins and of course, to the Courts and Appeals Council, I'm very familiar with his file. … This case has been before us twice. … We need to put an end to this case one way or the other. Hopefully the people who are reviewing this case, either when I pay this case or not, will realize I spent the time to know the facts of your case." (R. at 350).

\*\*\*

> "Usually in a case with the remands and as old as this case is, it's an issue to expedite it, move it as fast as possible. I'm not going to follow that procedure in this case because this case has been heard twice by two different Judges. And this is the third Judge. It's been before the Courts. It's been to the Appeals Council over and over again. … Eighth Circuit. I mean so this case has been around. … So I'm going to leave the case open 60 days, not 30, but 60. And 60 days, that will give you time to have all the tests done to show anything that is going on with this individual. And if I don't receive anything within 60 days, I'll presume this case is ready for decision. But I'm not going to rush this case. And hopefully, we can put this case to rest one way or the other." (R. at 360-61).

\*\*\*

4

> "Counsel, … I appreciate your arguments, and that's what I want. I want genuine discussion on this case … [b]ecause we didn't have it on the last two cases. … The courts need to know that we're working this case … [t]o get a proper decision." (R. at 370).

***

> "Before I give my hypotheticals in this matter, Counselor, please be aware that my cases usually last 45 minutes at most. This case has gone on for an hour-and-a-half. It is not your fault. A lot of the time, I spent in terms of detailed examination." (R. at 376).

***

> "It's been a long case. It's been drawn out, but it was required in this situation. Been to the Eighth Circuit, like you said. It's unusual that we have Eighth Circuit cases. So, this is a case if it goes to the District Court, they're going to be worried about the Eighth Circuit things. We got to make sure we cover all our bases." (R. at 386).

However, in rendering the *third* administrative decision in this case, the ALJ fell *far short* of achieving his espoused goal.

### IV. **Discussion:**

Watkins argues that the ALJ erred: (1) in failing to properly analyze Watkins's mental impairments; (2) in finding him capable of performing light work; and (3) in finding that his testimony was not entirely credible. After carefully reviewing the record, the Court concludes that all three of Watkins's arguments have merit.

The medical record establishes that Watkins received mental health treatment on many occasions between 1999 and 2015. During that time he was diagnosed with the following mental problems: bipolar affective disorder type I; borderline personality disorder; mixed personality disorder; panic disorder; generalized anxiety disorder; agoraphobia with panic disorder; attention deficit disorder; and depression. (R. at 116, 130, 179, 533, 576, 583, 620, 629, 694, 697).

The combined effects of his mental problems have led to a long, medically documented history of self-mutilation (R. at 119, 353-54, 693-94); violent mood swings and outbursts (R. at 151, 155, 179, 371, 373-75, 638, 648, 663, 687, 693); and difficulty with focus and concentration (R. at 156, 179, 577, 617-19, 626, 628, 635, 638, 640, 646, 648, 651, 656, 664, 675-76, 681, 693). On numerous occasions, Watkins related to his therapist that he was unable to handle crowds or be around other people. (R. at 616, 620, 626, 628, 684). His housemate testified that there are periods of ten days to three weeks that he will not even interact with other members of his own household. (R. at 373). His girlfriend testified that he cannot be around people and that going to a child's birthday party made him a "nervous wreck." (R. at 365).

The ALJ extensively questioned Watkins and his other witnesses. The ALJ asked Watkins about his body piercings and his January 2001 statement to a therapist that he was an "exhibitionist" and wanted "to stand out in a crowd." (R. at 147). The ALJ stated that, *in his mind*, someone like Watkins, who had body piercings, must be trying to draw attention to himself. The ALJ stated that *he believed* this behavior was inconsistent with the anxiety Watkins testified he experienced when he was around other people. (R. at 347-48) ("This doesn't sound like a person who is afraid of people … and [doesn't] want to be acknowledged."). If the ALJ had more closely examined the opinions and records of the *medical experts* who had treated Watkins

6

for many years, instead of making his own diagnosis of Watkins's mental problems, he would have discovered that Watkins's diagnosis of "borderline personality disorder" often manifests itself in attention-seeking behavior, impulsivity, and self-mutilation. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 663–64 (5th ed. 2013) ("*DSM-5*").

During the administrative hearing, Watkins testified that his body piercings were "a form of therapy" for his propensity to engage in self-mutilation. (R. at 351). Consistent with that testimony, in March 2015, Watkins told his treating psychiatrist that his multiple body piercings were "almost like therapy; it's like a release." (R. at 693). His treating psychiatrist noted that Watkins "[h]as symptoms of borderline PD *including [history of] cutting, and has multiple piercings … that were obtained during times of stress and brought [him] relief."* (R. at 694.) Thus, based on the medical evidence, there was *nothing* to support the ALJ's subjective belief that Watkins's body piercings were "inconsistent with" his testimony that he experienced serious anxiety when he was around other people.

Medical experts have also diagnosed Watkins with agoraphobia. The defining features of agoraphobia are fear or anxiety triggered by being in a crowd or being outside of the home and around other people. *DSM-5* at 217–19. The DSM-5 notes that most individuals with agoraphobia have additional mental disorders. *Id.* at 221.

7

Rather than accepting the opinions of the medical experts who treated Watkins for his long-term mental problems, the ALJ injected himself into the realm of psychiatry and concluded, *in his medical opinion,* that it was unbelievable that Watkins could attend a child's birthday party if he feared such situations. (R. at 365–70).[4] As the DSM-5 states, an individual with agoraphobia will experience intense fear or anxiety "if he or she is unable or *decides not to avoid* [the agoraphobic situation]." *DSM-5* at 218 (emphasis added). As Watkins's attorney observed, "he's got to live." (R. at 370). A claimant is not required to show that he is helpless or on the brink of institutionalization to prove mental impairments that may be disabling. *See Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

The ALJ's statements and questions during the administrative hearing demonstrate that he did more than consider whether the testimony of Watkins and his other witnesses was consistent with the medical records. He decided to be an armchair psychiatrist and make his own diagnosis of Watkins's mental limitations and then use his own personal medical opinions to discount the credibility of Watkins and his other witnesses. Under long-established Eighth Circuit case law, an

---

[4]After questioning Watkins's girlfriend at length about the party, the ALJ stated: "Do you see what I'm going through in my mind in terms of mental gymnastics, trying to figure out Mr. Watkins. Certain things don't make sense. He goes to a birthday party he didn't have to attend, but he says he couldn't handle it. When he didn't even have to be there. It's not like it was his mother's birthday party, or the birthday party was held in the house, or your birthday party. … It was a friend of your child's birthday party, and we're dealing with young kids, and he voluntarily goes and put himself in a stressful situation." (R. at 367).

ALJ is not permitted to "play doctor." *Pate-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009).

The ALJ also relied heavily on a one-time consultative examination performed by Kenneth B. Jones, Ph.D., on June 2, 2014 (R. at 271, 552-59). After examining Watkins, Dr. Jones concluded that he had *no mental limitations*. However, in reaching that conclusion, Dr. Jones performed no diagnostic testing, only reviewed Watkins's treatment records from *2001-05*, and was unaware that Watkins began active mental health treatment several months *before* Dr. Jones evaluated Watkins.

According to Watkins's medical records, on March 5, 2014 - less than three months *before* Dr. Jones evaluated him – Watkins began regular mental health treatment at Mid-South Health Systems, Inc. He did so because he wanted to "have a more level state of mind" and "be able to control [his] emotions." (R. at 618-19). At the time he initiated this treatment, Watkins reported that he had "stress or anxiety"; felt like his skin and teeth were "crawling"; got "real antsy, irritated" from his living arrangements; had to "shut [him]self out" by playing "extremely loud music to block out stressors"; "felt like [he was] on sensory overload"; and had "poor" attention and concentration. (R. at 616). The examiner reported that he had "intense eye contact," rapid speech and "flight of ideas." (R. at 618).

At a psychiatric evaluation on March 18, 2014, APN Charlene Brown diagnosed Watkins with generalized anxiety disorder and agoraphobia, with panic disorder. He had a Global Assessment of Functioning ("GAF") score of 50, reflecting "serious" symptoms or impairment in functioning. (R. at 628-31). The treatment plan was individual therapy and medication management.

One year later, on March 11, 2015, Watkins's treating psychiatrist, Kelly Hair, M.D., performed an annual psychiatric examination. Dr. Hair noted that, despite medication and attending therapy sessions "roughly every two weeks," Watkins still had a "lot of anxiety," as well as symptoms of borderline personality disorder, which included a history of cutting and obtaining multiple piercings during times of stress. He had a GAF of 48, again reflecting "serious" symptoms or impairment. Dr. Hair diagnosed Watkins with generalized anxiety disorder; agoraphobia, with panic disorder; and borderline personality disorder. (R. at 693-95).

Thus, Dr. Jones's June 2, 2014 opinion that Watkins had "no mental limitations" is *inconsistent with* the contemporaneous treatment records from Watkins's *mental health providers*. (R. at 616-98). Additionally, Dr. Jones's opinion was formed after seeing Watkins *one time*; performing *no diagnostic testing*; and relying only on medical records from 2001 to 2005. It was plain error for the ALJ to rely entirely on Dr. Jones's opinion to conclude that Watkins had no mental

limitations and, in doing so, to reject the opinions of Watkins's treating psychiatrist and other mental health providers.

Finally, Watkins's mental health treatment records from 2001-2005 are *consistent with* his mental health treatment records from 2014 and 2015 and do *not* support Dr. Jones's startling finding that Watkins had "no mental limitations." For example, at a psychiatric evaluation on March 26, 2004, Watkins described "chronically racing thoughts," "garbage thoughts" and paranoia, self-mutilatory activities, suicidal ideation, and recurring manic episodes. (R. at 119-20). On January 9, 2006, Watkins told June Powell, M.D., that he was experiencing "blind rages" and paranoia, and was hearing "his thoughts aloud." Dr. Powell observed that Watkins "relate[d] only to himself" and "lack[ed] social amenities," he had "active delusions and hallucinations," his judgment was poor, and his insight was limited. She diagnosed: (1) psychosis NOS; (2) mixed personality disorder ("narcissistic, explosive and not otherwise specified of the passive/aggressive type"); and (3) moderate psychosocial stressors related to his paranoia and difficulty getting along with others. She assigned a GAF of 50. (R. at 179-80).

In 2011, the Eighth Circuit reversed the first ALJ's decision, and remanded the case with directions that the ALJ reevaluate Watkins's mental impairments. At that time, the Court characterized Watkins's early 2006 mental status examination findings as "*almost entirely abnormal.*" *Watkins,* 414 F. App'x at 896 (emphasis

added). Despite the voluminous medical records documenting Watkins's long-term treatment for numerous severe mental impairments, the current ALJ reached the erroneous and factually unsupported conclusion that Watkins's mental impairments were *non-severe* and had *no effect* on his ability to work.

The Commissioner argues that Watkins's claim of disabling mental impairments is undermined by his failure to obtain any mental health treatment between January 2006 and March 2014. However, such a gap in receiving mental health treatment does not necessarily mean the underlying mental illness has ceased to exist. *See Mabry v. Colvin*, 815 F.3d 386, 392 (8th Cir. 2016); *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Furthermore, because those afflicted with mental illness are often unable to appreciate their problems or their need for treatment, they try to "structure[] [their lives] in such a way as to minimize stress and reduce their signs and symptoms." *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Thus, in evaluating mental impairments, the regulations require an ALJ to consider "all relevant evidence to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1).

The records from Watkins's mental health providers show that he received mental health treatment regularly, and was experiencing significant difficulties in functioning, from 1999 to January 2006, and then from March 2014 through March

2015. In addition, records from his primary care physician show reports of anxiety and depression throughout 2013 and early 2014, which were treated with a prescription for Celexa, an anti-depressant. (R. at 520, 527, 529, 531, 545, 577, 581, 583). On July 11, 2013, Watkins told his primary care physician he "need[ed] to see Mental Health" for bipolar disorder because he "does go off sometimes." He was referred for mental health treatment. (R. at 533-34). When he resumed regular mental health treatment, in March 2014, he stated that his anxiety had "re-emerged" due to his stressful home environment, where he lived with seven people and more than forty animals in a three-bedroom house. (R. at 628). He also reported that he had been unable to work for ten years due to chronic pain and an inability to "think or focus long enough." (R. at 617, 619, 626). Thus, nothing in the medical records suggests that the gap in Watkins's mental health treatment was related to an improvement in his mental impairments, much less that those mental impairments ceased to exist, as found by the ALJ.

The current ALJ's errors were not confined to his evaluation of Watkins's mental impairments. In finding that Watkins had the RFC for *light work*, the ALJ criticized the two previous ALJs for concluding that Watkins was only capable of performing sedentary work. The current ALJ faulted his colleagues for getting

"caught up in the doctor's analysis and the doctor's conclusions." (R. at 377).[5] According to the current ALJ, he "combed through" Watkins's medical records and determined that the "conclusions" of his physicians were not supported by objective examinations or testing. (R. at 355-60, 377). These nebulous and conclusory statements by the ALJ, after carefully "combing" the medical record, fall far short of the substantial evidence required to support Watkins having the RFC to perform light work, a determination that was *rejected* by the two previous ALJs in this case. *See Culbertson v. Shalala,* 30 F.3d 934, 940 (8th Cir. 1994) (upholding an ALJ's decision that weighed the evidence differently from a prior ALJ, where the second determination was supported by substantial evidence).

In determining Watkins's RFC, the ALJ's decision does not reflect that he considered Watkins's daily activities. Furthermore, the ALJ assigned significant evidentiary weight to the 2007 opinion of a consulting orthopedic specialist, Harold Chakales, M.D., even though Dr. Chakales opined that Watkins could only occasionally lift weights up to twenty pounds, *with no frequent lifting*. (R. at 205, 272). Neither Dr. Chakales's consulting opinion, nor the opinion of Watkins's

---

[5]Of course, in "getting caught up in" the "doctor's analysis and the doctor's conclusions," *the earlier ALJs were doing precisely what they were supposed to do*. The current ALJ's entirely gratuitous and unfair attack on two of his colleagues, to bootstrap his factually unsupported finding that Watkins was capable of performing light work, suggests that the ALJ is grasping at straws to support his decision.

14

treating physician,[6] supports an RFC for light work, which requires *frequent lifting* of up to ten pounds. (R. at 166). *See* 20 C.F.R §§ 404.1567(b), 416.967(b).

Finally, the ALJ's determination that Watkins is capable of performing light work is inconsistent with the Eighth Circuit's opinion reversing and remanding the first ALJ's decision. The Court affirmed "the ALJ's physical RFC findings [supporting sedentary work]," which "were not only more limited than those of consulting physician Harold Chakales, but *also consistent with the treatment records* and the decision to discredit – we conclude correctly – Watkins's related subjective complaints." *Watkins,* 414 F. App'x at 896-97 (emphasis added).

Thus, the Eighth Circuit *upheld* the first ALJ's determination that Watkins's RFC limited him to *sedentary work* and remanded the case for a reevaluation of Watkins's *mental impairments*. *Id.* at 897. On remand, the second ALJ also concluded that Watkins had the RFC for *sedentary work*. (R. at 408, 412). As a result, the current ALJ erred in: (1) erroneously determining that Watkins now had the RFC to perform *light work*; and (2) minimizing, mischaracterizing, and unfairly evaluating Watkins's serious mental impairments to reach the conclusion that he had *no severe mental impairments.*

---

[6]That physician, William S. Winston, II, D.O., wrote a letter on March 27, 2006, opining that, due to Watkins's severe back and knee pain, he was unable to engage in "any type of work." (R. at 166).

The current ALJ asked the VE four hypothetical questions, but chose not to rely on the VE's answer to the fourth question, which: (1) imposed significant mental impairments on the hypothetical claimant, which caused problems with concentration, reliability, persistence and pace, and prevented the hypothetical claimant from working an eight-hour day or forty-hour work week on a regular consistent basis; and (2) limited the hypothetical claimant to sedentary work. (R. at 381). The limitations in the fourth hypothetical question *closely match* Watkins's limitations and are *strongly supported* by substantial evidence in the medical record. The VE responded to the fourth hypothetical question by stating that such a hypothetical claimant, with those physical and mental limitations, would *not* be able to perform *any jobs* in the national economy, which meant such an individual was *disabled*. (R. at 382).

Watkins's long medical history of physical limitations demonstrates that, at most, he can perform only sedentary work. He also suffers from serious long-term mental impairments that significantly limit his concentration, persistence and pace. Two earlier ALJs, the Eighth Circuit, and a consultative orthopedic specialist, all found that Watkins had physical limitations consistent with a sedentary RFC. As discussed, the medical evidence strongly supports Watkins's severe mental limitations restricting his concentration, reliability, persistence and pace. Based on the VE's answer to the ALJ's fourth hypothetical question, which fairly captured

and described Watkins's mental and physical limitations, the Court concludes that Watkins is disabled and entitled to an award of benefits. Thus, any further administrative proceedings on the issue of whether Watkins is disabled would only unnecessarily prolong the resolution of this case, which has already been pending for *thirteen years*. *See Taylor v. Chater,* 118 F.3d 1274, 1279 (8th Cir. 1997) (remanding for an award of benefits where, in response to a hypothetical that properly characterized claimant's disabilities, the VE testified that there were no jobs in the national or regional economy that such a hypothetical individual could perform).

"Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability," and where further administrative hearings "would merely delay receipt of benefits." *Pate-Fires*, 564 F.3d at 947; *Hutsell,* 259 F.3d at 714. In *Hutsell,* the claimant had "gone through three administrative hearings, three appeals to the Appeals Council, and many psychological evaluations" over a period of thirteen years, with no medical evidence demonstrating that she could engage in work on a sustained basis. After finding the ALJ had again committed reversible error, the Court remanded the case for an immediate award of benefits, rather than "prolong this case into its second decade." *Hutsell,* 259 F.3d at 713 -14; *see also Ingram v. Barnhart,* 303 F.3d 890, 894 (8th Cir. 2002) (awarding benefits due to agency's "inexcusably slow" handling

17

of claimant's claims over a nine-year period, its failure to timely assert certain arguments, and "unequivocal" evidence that the claimant met the requirements of a listing); *Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir. 2004) (remanding for the Commissioner "to decide the issue again would create an unfair 'heads we win; tails we play again' system of disability benefits adjudication"); *Seavey v. Barnhart,* 276 F.3d 1, 13 (1st Cir. 2001) (recognizing the "equitable power to order benefits in cases where the entitlement is not totally clear, but the delay involved in repeated remands has become unconscionable").

Accordingly, the Commissioner's decision in this case should be reversed and remanded for an award of benefits, with directions that the Commissioner must determine, on remand, the appropriate date for the onset of Watkins's disability so that the proper award of benefits may be calculated.[7]

## V.  **Recommended Disposition:**

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED for an award of benefits, with directions that the Commissioner must determine, on remand, the appropriate date for the onset of Watkins's disability so that the proper award of benefits may be calculated.

---

[7]*See Grebenick v. Chater,* 121 F.3d 1193, 1200-01 (1997) (in determining the date of onset of a disability, ALJ should consider the claimant's alleged date of onset, his work history, and the medical and other evidence of his condition; if the medical evidence is ambiguous, and a retroactive inference is necessary, ALJ must call upon the services of a medical advisor to insure that the determination of onset is based upon a "legitimate medical basis"); SSR 83-20, 1983 WL 31249 (Jan. 1, 1983) (establishing onset date of disability).

DATED this 12th day of January, 2018.

_____
UNITED STATES MAGISTRATE JUDGE